Isadobe Bookstbik, Off. Ref.
On August 5, 1960 a collision occurred on a public highway in this State between a motor vehicle owned and operated by defendant Sellnow and one owned and operated by decedent Romayne Lois Stone. It is claimed that decedent died as a result of said collision and that plaintiffs Rachel Edwards, Jean Toung and Romayne Stone and the infant plaintiff Sandra Stone were passengers in the vehicle owned and operated by decedent and that they sustained certain personal injuries as a result of such collision, due to the alleged negligence of defendant Sellnow. Decedent’s administrator instituted an action against defendant Sellnow to recover for her wrongful death; the adult passengers brought actions against him for damages for their claimed personal injuries; the infant plaintiff also brought such action, through her guardian ad litem. Plaintiffs Magnus E. Edwards, Sr., and Howard A. Young instituted derivative actions against Sellnow, as the husbands of their respective spouses. Plaintiff Carl B. Stone instituted a derivative action as the parent of the infant Sandra Stone. In these actions defendant Sellnow defaulted and those actions remain in that posture.
*166 All of such plaintiffs instituted this action for a declaratory judgment seeking a declaration as to which of the defendants (other than Sellnow) provided insurance coverage of Sellnow on the date of the accident. Defendant Sellnow has defaulted in this action, also.
Upon the trial, it was stipulated that defendant, the Travelers Insurance Company, was not involved and that the complaint, as to it, be dismissed upon the merits, without costs.
It appears that some time in December of 1959 Sellnow consulted one Franklin L. Shultes, an insurance broker, about procuring’ liability insurance for his then motor vehicle and was advised that, on his record, insurance could be obtained only through the Assigned Bisk Plan of the State of New York (hereinafter called “Plan”) (Insurance Law, § 63); that thereupon Shultes filled out an application to the Plan for such insurance and -Sellnow paid $75 towards the premium; the application was delivered to the Plan by messenger and the Plan assigned the risk to defendant “ The Travelers Indemnity Company”, hereinafter referred to as “Travelers,” which thereupon issued its policy, with maximum limits of $10,000 for one person injured and $20,000 for all persons injured in a single accident.
Shultes was not an agent of ‘1 Travelers ’ ’. In this situation, he was what is generally known in the insurance business as the “ producer ”, He was the agent of defendant Sellnow who did not have sufficient money to pay the total premium of $232.56. Shultes paid the premium to “Travelers” and received the policy, which, at all times, until he surrendered it to “ Travelers ”, remained in his possession. For the unpaid balance of the premium, Sellnow executed and delivered a note on a form, apparently furnished by the National Commercial Bank and Trust Company (hereinafter called “Bank”) which note is entitled “Premium Finance Note”, the material portions thereof in this controversy being as follows:
THE NATIONAL COMMERCIAL BANK AND TRUST COMPANY
PREMIUM FINANCE NOTE
Office Altamont N. Y.
Date Dee 31 1959
for value received the payor promises to pay to the order of Franklin L. Shultes
One hundred sixty-eight and 00/100................Dollars ($168.00) at the MAIN OFFICE of THE NATIONAL COMMERCIAL BANK AND TRUST COMPANY, Albany, New York, in 8 monthly installments of $18.67 each, commencing on Jan. 30, 1960, with a final installment of $18.64.
To secure payment of the full amount owing by the payor under this note, the payor hereby assigns to the payee, its successors and assigns, all return *167 or unearned premiums, all dividends, and all losses which are or may become payable to payor under the insurance policies set forth 'below, (or any policies issued in substitution) which said policies are hereby delivered to the payee.
Date of Policy Policy Number Insurance Company Premium Term
12/17/59 QMV7942039 Travelers 232.56 1 yr.
Amount of
Premium (s) $232.56
Down
Payment $ 72.56
Balance $160.00
Service
Charge 8.00
Amount
of Note $168.00
(1) In the event of default in the payment of any installment of this note, the unpaid balance thereof shall become immediately due and payable, and payor agrees that such default shall be construed as and shall be notice to cancel said policies of insurance and the payee or payee’s assignees may deliver said policies to the insurance company issuing same for cancellation and receive any and all return premiums thereon and receipt therefor in the name of the payor.
(2) The payor does hereby irrevocably appoint the payee, or in the event this note is held by The National Commercial Bank and Trust Company, Albany, N. Y., said Bank, his attorney-in-fact to effect cancellation of said policies, as well as to collect any moneys payable for any reason under said policies, to give receipt, release and acquittance therefor, and to do every other thing necessary in connection therewith, with full power of substitution, hereby ratifying and confirming all such attorney-in-fact, or its substitute may lawfully do hereunder.
The last two paragraphs above do not contain the numerals (1) and (2) in the original note. They are inserted herein for convenience by way of reference.
Shultes discounted the note with “ Bank ”, by a full recourse indorsement and guarantee of payment, and recived the proceeds of such discount, which, together with the $75 deposit paid by Sellnow, furnished the funds to pay to ‘ ‘ Travelers ” its premium in full.
“ Travelers ” in compliance with the financial security provision of the Motor Vehicle Law issued the form FS-1, which certifies to the insurance being in effect under the policy issued by it, and which form was filed with the Motor Vehicle Department as required by law. (Vehicle and Traffic Law, former § 93-b, now § 312.)
The decedent had a liability policy on her own motor vehicle issued by Allstate Insurance Company which contained an uninsured motorist’s indorsement as provided for in subdivision 2-a of section 167 of the Insurance Law, which brings in the *168 defendant, Motor Vehicle Accident Indemnification Corporation, hereinafter referred to as “MVAIC”, as the insurer, to indemnify these plaintiffs, if at the time of the accident Sellnow was an uninsured motorist and was legally liable for the damages caused in the collision which occurred. (Insurance Law, art. 17-A.) The statutory limits of its liability is the same as the statutory and contractual limits of “ Travelers ”, to wit, $10,000 for one person, and $20,000 for all persons injured in a single accident.
So far as plaintiffs are concerned, it is of no moment whether ‘ ‘ Travelers ” or “ MVAIC ’ ’ is the insurer.
The claim of “ Travelers ” is that Sellnow, on the date of the collision, was an uninsured motorist, by reason of its having duly terminated its policy, before the date of the collision. If that be so then “ MVAIC ” is the insurer in the situation and not “Travelers”. “MVAIC” has refused to negotiate or arbitrate on the contention that the policy of “ Travelers ” was in force and that, hence, “ Travelers ” is the one required to defend Sellnow and is the one liable, within its policy limits, for any recoveries against Sellnow in the negligence actions against him.
In that situation, plaintiffs instituted this action for a declaratory judgment which would declare which of the two defendants, “ Travelers ” or “ MVAIC ” afforded coverage on the date of the collision, i.e., on August 5,1960.
Defendant “ Travelers ” moved to dismiss the complaint on the ground that the controversy was not the proper subject of an action for a declaratory judgment.
If the declaratory judgment sought were denied, plaintiffs would have to obtain judgments in their negligence action and then sue “ Travelers” under paragraph (b) of subdivision 1, and subdivision 7 of section 167 of the Insurance Law; if “ Travelers ” succeeded in that action by reason of its policy not being in force, a determination which would not be binding upon “ MVAIC ”, plaintiffs would then have to proceed against the latter, in which event it is possible that there could be an inconsistent result in a determination that “ Travelers ” policy was in force and that, hence, “MVAIC” had no liability, a determination not binding on ‘ ‘ Travelers ’ Thus, there can be envisaged a multiplicity of suits and the possibility that plaintiffs would have no insurance protection, when it cannot be doubted that they have the benefit of coverage of either ‘‘ Travelers ’ ’ or “ MVAIC ”.
Accordingly, the motion of “ Travelers ” to dismiss the complaint is denied, with an appropriate exception noted for *169 “Travelers”. (Cf. Post v. Metropolitan Cas. Ins. Co., 227 App. Div. 156, affd. 254 N. Y. 541.)
We come then to the merits and the ultimate question for determination is whether or not “ Travelers ” had effectively terminated its policy prior to the date of the accident, to wit, August 5,1960.
As to the facts there is virtually no dispute. The only one actually disputed is whether or not “ Travelers ” did mail to Sellnow a notice of termination. The contention on that score is shadowy and unsubstantial and I find that “ Travelers ” did mail such notice on June 14, 1960 and therein stated the effective date of the termination as July 5, 1960. This gave the full 20 days’ notice required by section 93-c (now Vehicle and Traffic Law, § 313). In further compliance with said section “Travelers” filed with the Motor Vehicle Department on August 3,1960 notice of cancellation. (Form FS-4.) The notice to Sellnow contained the matter required by said section to be contained therein.
Thus, there was complete compliance with the requirements of section 93-c (now § 313) to consummate a cancellation and termination of its policy effective July 5, 1960.
The further contention is advanced that “Travelers” did not comply with sections 18 and 19 of the Assigned Bisk Plan in that the notice of cancellation to Sellnow did not contain a statement that the insured has a right of appeal to the governing committee of the Plan.
Section 18-A of the Plan reads as follows: “ If for any reason the insured requests cancellation, the carrier shall retain the short rate earned premium, for the period of coverage or the sum of $10.00 per car, whichever is greater, and return the balance to the insured. ’ ’
Section 18-A requires no notice to the insured of the cancellation. Obviously, there would be no purpose to be served, so far as the insured is concerned, in giving him notice of a cancellation which he himself requests, either personally or through an authorized agent.
Section 18-B of the Plan deals with cancellation of the policy by the company, for various reasons therein set forth, all of which are reasons other than the request of the insured, which, as we have already seen, is covered by section 18-A.
Section 19 of the Plan confers a right of appeal on an insured whose policy is cancelled and requires that the notice of cancellation, issued under the Plan (as was the policy in question) shall contain a statement that the insured has a right of appeal to the governing committee of the Plan.
*170 No such notice was given here. Nor was one required. The notice provided for in section 19 clearly refers to a cancellation under section 18-B of the Plan and not to one under section 18-A of the Plan, under which the cancellation is at the request of the insured or his agent, whereas a cancellation under section 18-B is one contrary to the wishes or desires of the insured, who may have proper grounds for successfully resisting a cancellation under section 18-B of the Plan.
As already stated, to give notice of appeal to the insured of a cancellation, requested by him or his agent is pointless, as requiring notice that he can appeal from action resulting from his own request.
The contention is advanced that the cancellation in this ease was for nonpayment of premium, which would come under section 18-B of the Plan, which would then require the notice of cancellation to contain the statement required by section 19 of the Plan, as to the right to appeal. In support of such contention it is argued that ‘1 Travelers ’ ’ made a refund on a prorata basis which it is required to do under section 18-B of the Plan, rather than on a short-rate basis as permitted under section 18-A, and further that “Travelers” took the steps required by section 93-c (now § 313) of the Vehicle and Traffic Law.
There are several complete answers to these contentions. In the first place, the Plan contains no provision for a cancellation by an insurance company at the request of the holder of a premium finance note with an assignment of the policy as security for the payment thereof. Hence, since there is no specific regulation in the Plan on that subject, “ Travelers ” quite properly treated the refund on the same basis as would be required in the case of a cancellation for nonpayment of premium, so far as a refund and compliance with section 93-c (now § 313) of the Vehicle and Traffic Law are concerned. Indeed, for those limited purposes it treated the cancellation in the same manner as a cancellation initiated by it, since, actually and factually, Selinow did not personally request cancellation. The cancellation was brought about in an entirely different manner, as will hereafter appear.
In the second place, “ Travelers ” could not cancel for nonpayment of premium, since it had received the premium in full even if the payment was actually not made by Sellnow.
In the third place, the notice of termination expressly gave as the reason, not the nonpayment of premium, but rather the reason was given as “ Agent’s Bequest ”.
*171 In the fourth place, there is testimony that when a policy is cancelled at an agent’s request, the policy of “ Travelers ” is to make a refund on a prorata basis, since that gives the agent, and consequently the insured, a better refund, thereby minimizing the loss.
In the fifth place, section 93-c (now § 313) of the Vehicle and Traffic Law permits a 10-day notice of cancellation, for nonpayment of premium, whereas for any other cause the notice must be one of 20 days. Here “ Travelers ” gave the 20-day notice, because in the situation here present, it could not give the 10-day notice, since, so far as it was concerned, there was no nonpayment of premium.
There appears to be some contention that since “ Travelers ” gave the notice required by section 93-c (now § 313) of the Vehicle and Traffic Law, this should be considered as the notice required by section 19 of the Assigned Bisk Plan. This is a non sequitur. As a matter of fact “ Travelers ” makes no claim that it gave the notice required by section 19 of the Plan. Its position is that no notice was necessary under the Plan, since the cancellation was under section 18-A of the Plan, which deals solely with a cancellation requested by the insured.
Compliance with section 93-c (now § 313) of the Vehicle and Traffic Law cannot be tortured into an attempt to comply with section 19 of the Plan.
‘ ‘ Travelers ’ ’ had no choice but to comply Avith section 93-c (noAV § 313) of the Vehicle and Traffic Law, if it Avas to effectively terminate its insurance.
Begardless of common-laAv rights, the insurer can no longer cancel a policy either ab initio or instanter. All cancellations, by reason of section 93-c (now § 313) of the Vehicle and Traffic Law, must be prospective or in future. (Teeter v. Allstate Ins. Co., 9 A D 2d 176, affd. 9 N Y 2d 655.) The same rule applies to an assigned risk policy. (Ætna Cas. & Sur. Co. v. O’Connor, 8 N Y 2d 359.)
There is left, then, only for determination the right of “ Travelers ” to cancel or terminate the policy.
It appears that when the first payment was due on account of the note hereinbefore set forth, SellnoAV defaulted. After some delay, that payment was made by Sellnow. Thereafter, he defaulted again and Shultes was notified. After some effort, he obtained from Sellnow’s mother the sum of $40 and paid to “ Bank ” two past-due installments and mailed a check to defendant for the small difference between the amount of the two installments and the $40. Thereafter, Sellnow again defaulted, and Shultes was notified by the “ Bank ”, but was unable to *172 contact Sellnow. By June 10,1960 Shultes had to make good to the “ Bank ” the balance due under the aforesaid note, to wit, $112.02. .On that date he wrote the “ Travelers ” inclosing the policy and a copy of the aforesaid note, advising “ Travelers ” that Sellnow had defaulted thereon and requesting “ Travelers ” to cancel the policy. “ Travelers ” complied and took all of the .steps required by law to effect a cancellation, so that, if it had a right to cancel, its policy was no longer in force and effect on August 5,1960, the date of the collision.
It is not disputed that if “ Bank ” requested “ Travelers ” to cancel, “ Travelers ” would have had the right to do so.
On the other hand, it is contended by plaintiffs and defendant “ MVA1C ” that “Travelers” had no right to do so on the request of iShultes. That contention is made on a very narrow and technical basis.
It appears that Shultes made his request of “ Travelers ” by his letter dated June 10, 1960; that he issued his check to “ Bank ” on June 13,1960 and mailed it to the Altamont Branch of “ Bank ” and accordingly it was not credited on the books of “Bank” at Albany until June 16, 1960. Parenthetically, “Bank” obviously erroneously mailed the note to Sellnow instead of .Shultes, but did not stamp it “paid” as was customary if the note was paid by the maker. Sellnow admitted that he did not make that payment and the check of June 13,1960 demonstrates that Shultes did.
In this situation, the contention of plaintiffs is that Shultes was not the “ holder ” of the note on June 10, 1960 when he wrote “ Travelers ” requesting cancellation and did not become the holder until June 16,1960 when the bank gave credit for the balance of $112.02 paid by Shultes.
The determination of the ultimate issue herein depends upon the right of Shultes to request “ Travelers ” to cancel and the right of “ Travelers ” to comply with that request. And that issue it is claimed depends upon the construction to be given to the language employed in the “ Premium Finance Note ”.
Incidentally, evidence was introduced that it is the policy of the t ‘ Bank ” not to set in motion machinery for cancellation of a policy itself but to require the payee and indorser of the premium finance note to do so.
The contention seems to be that Shultes technically was not the holder of the note on June 10,1960, when he wrote “ Travelers ” but that “ Bank ” was.
Paragraph (1) of the note, following the amount thereof recites that “ default shall be construed as notice and shall be notice *173 to cancel said policies of insurance and the payee or the payee’s assignees may deliver said policies to the insurance company issuing the same for cancellation ”.
This unequivocally authorizes either Shultes or “ Bank ” to deliver the policy of “ Travelers ” to it for cancellation, in the event of default therein and that such default shall be construed as a request by Sellnow to cancel the policy.
By paragraph (2) of the note, Sellnow irrevocably appoints the payee (Shultes) or in the event the note is held by “ Bank ”, said ‘ ‘ Bank ’ ’, his attorney in fact to effect cancellation, and to do everything necessary in connection therewith, with full power of substitution, ratifying and, confirming all such attorney-in-fact, or its substitute may lawfully do thereunder.
The intention of the language of the note is clear and unmistakable. The intention plainly is that either Shultes, the payee, or ‘ ‘ Bank ’ ’ the assignee, should have the right to surrender the policy for cancellation in the event of default. There can be no doubt about that as to paragraph (1) of the note.
If, perchance, paragraph (2) of the note, which appoints an attorney in fact, may be so narrowly construed as to limit its application to either the payee or the “ Bank ” whichever at the moment of action thereunder is the actual and technical holder of the note, and if in the hiatus between June 10 and June 16, the “ Bank ” was technically the holder of the note, then the latter part of paragraph (2) of the note, giving the holder “full power of substitution, hereby ratifying and confirming all such attorney-in-fact, or its substitute may lawfully do hereunder/’ certainly authorized “ Bank ” to substitute Shultes to take the steps necessary to surrender and cancel the policy and, in that view, “ Bank ” did so.
To hold otherwise would negate the plain and clear intention of the parties and substitute shadowy form for substance.
New York Automobile Assigned Bisk Plan does not prohibit a cancellation of an assigned risk policy by the insured or his duly authorized agent.
In First Trust & Deposit Co. v. Middlesex Mut. Fire Ins. Co. (259 App. Div. 80, 86-87), the court said: “The permission in the premium note, permitting the investment corporation to cancel the policy, was sufficient as an authorization to the investment corporation to cancel the policy on behalf of the insured. (C. F. I. Co. v. Ætna Ins. Co., 127 N. Y. 608.) ”
It is elementary that anything a person can do lawfully he may do through an agent. (Torre v. Grasso, 11 Misc 2d 275, 276.)
*174 “ Cancellation of such a policy” (a compulsory insurance policy) “ by the insured is not an act so personal in its nature that it cannot be delegated in the absence of statutory prohibition of such delegation.” (Chamberlain v. Employers’ Liab. Assur. Corp., 289 Mass. 412; see, also, Angelo v. Traviglia, 7 Ohio Op. 2d 383, 79 O. L. Abs. 342.)
Parenthetically, it is interesting to note, in connection with the cancellation of an insurance policy by the holder of a premium finance note, there was no statutory regulation of the steps to be taken by the holder of such a note, to effect a cancellation of a policy, at the time when “ Travelers ” served its notice of cancellation on June 14,1960.
By chapter 488 of the Laws of 1960, effective July 1, 1960, there was added to the Banking Law article XII-B, regulating the subject of Insurance Premium Finance Notes. That chapter by section 576 of the Banking Law, since July, 1960, regulates the notice to be given of a cancellation at the request of the holder of the premium finance note and provides that in such ease the notice, etc., shall be regulated by that section rather than by section 93-c (now § 313) of the Vehicle and Traffic Law.
The length of time is shorter than that which was given in this case under section 93-c (now § 313) of the Vehicle and Traffic Law and said section 576 of the Banking Law does not require the notice required by section 19 of the Assigned Bisk Plan, i.e., with reference to any right to appeal.
While, of course, that new statute has no application in the situation here presented, it is persuasive of the fact, that, in the absence of such a statute, “ Travelers ” proceeded in proper manner.
I conclude that “ Travelers ” policy was not in force on August 5, 1960; that it had been effectively terminated on July 5, 1960.
It necessarily follows that, on August 5, 1960, under the uninsured motorists indorsement on the Allstate policy of deceased, deceased was operating an “ Insured motor vehicle ”; that defendant Sellnow was operating an “Uninsured motor vehicle ”; that defendant Sellnow was a “Financially irresponsible motorist”; that deceased was an “Insured” and that the other plaintiffs were “Qualified persons”; all as defined in section 601 of the Insurance Law.
It, therefore, follows further that coverage for the accident of August 5, 1960 is afforded by defendant “ MVAIC ”.
In view of the conclusions reached, the motions of “ Travelers ” at the close of plaintiffs’ case and at the close of the *175 entire case, to dismiss the complaint, are denied, with appropriate exceptions to “ Travelers ” noted.
This constitutes my decision under section 440 of the Civil Practice Act.
Plaintiffs and defendant “ Travelers ” are entitled to declaratory judgment, in accordance with the foregoing decision.